## PHILLIPS v. YON.

1. GUARDIAN AND WARD.—FINDING OF FACT by Circuit Judge that guardian did not pay for land in question with funds belonging to his wards, reversed.
2. EVIDENCE.—A JUDGMENT is admissible to prove a collateral fact as against parties not parties to such judgment.
3. GUARDIAN AND WARD—ACCOUNTING—ESTOPPEL—FRAUD—LACHES—EQUITY.—Where a guardian pays for lands sold as estate lands by receipting for purchase price as funds belonging to his wards, who are children of the deceased, and in a proceeding afterwards brought to marshal assets of estate to which wards are parties, lands set apart to wife of deceased as her distributive share in part are sold to pay debts, and all assets of intestate are collected and applied to debts, wards not bringing to the attention of the Court that lands are so paid for by guardian, they after long lapse of time will not be heard in court of equity to compel guardian to account to them for purchase money of such land, but Court will leave parties where it finds them.
MR. JUSTICE POPE dissents.

Before TOWNSEND, J., Orangeburg, August, 1899. Affirmed.

Action for accounting by Minerva C. Phillips et al. against Benjamin A. Yon, guardian et al. From Circuit decree the plaintiffs and the defendant children of Paul D. Jeffcoat appeal.

Messrs. Izlar Bros and J. A. Muller, for appellants, cite: *As to the rule applicable to cases on appeal where special*

*master and Circuit Judge differ as to findings of fact:* 44 S.
C., 437; 26 S. C., 250; 42 S. C., 86; 26 S. C., 446; 6 S. C.,
140; 12 S. C., 616, *and cases cited in reporter's notes;* 55 S.
C., 189; 56 S. C., 168; 57 S. C., 533; 56 S. C., 480; 58 S.
C., 284; 34 S. C., 102; 30 S. C., 245; 30 S. C., 467, 617.
*If bond for land were paid in confederate money, it does not
extinguish the debt:* 15 Ency., 706, 707; 34 S. C., 441; 1
DeS. Eq., 460.

*Messrs. Raysor & Summers,* contra, cite: *Where referee
and Circuit Judge differ on question of fact, the rule is that
latter is prima facie right:* 12 S. C., 154; 16 S. C., 469; 24
S. C., 585; 26 S. C., 595, 250; 44 S. C., 438. *Appellant
having failed to except to finding by referee that guardian
received no money from administrator, cannot press that
question on appeal:* 20 S. C., 427; 18 S. C., 230; 40 S. C.,
533. *As to force of parol testimony in establishing a trust:*
6 S. C., 102. *Judgment cannot be inferred from appear-
ance in record of certain steps leading to it:* 12 S. C., 144;
58 S. C., 390. *After this long lapse of time, it is presumed
that the guardian's indebtedness to the estate and to his
wards had been actually considered in proceeding to mar-
shal assets:* 33 S. C., 305. *That suit bars this action:* 17 S.
C., 35; 52 S. C., 166. *And being a judgment in rem, it is
binding not only on parties but on whole world:* 12 Ency.,
149; 21 Ency., 130; Herman on Es., 355-374; Big. on Es.,
4 ed., 225; Freeman on Judgt., sec. 606; 66 Am. Dec., 290;
12 Rich., 13; 20 Vt., 65; 81 Am. Dec., 626; 28 Md., 174; 2
Black on Judgt., secs. 635, 638; 140 Mass., 411; 2 Ired. Eq.,
294; 6 N. Y., 190; 1 Met., 204. *As to parol evidence in
setting aside a deed:* 19 S. C., 135; 1 John. Ch., 590. *If
guardian is liable, he is entitled to commissions:* 1 Strob.
Eq., 31. *Administrator only required to pay interest with
annual rests in certain cases:* 2 McC. Ch., 10, 185; 9 S. C.,
363; 11 S. C., 95. *Compound interest should cease on
wards arriving at maturity:* 9 Ency., 119; 11 Bush. Ky.,
120; 3 Metc. Ky., 548; 71 N. C., 190; 68 N. C., 40.

*Mr. J. Wm. Thurmond,* also contra, cites: *Trusts are entirely within equity jurisdiction:* 52 S. C., 472. *Appellants must satisfy this Court that findings by Circuit Judge are against the preponderance of the evidence:* 55 S. C., 202. *As to kind of evidence necessary to establish a resulting trust by parol:* 27 Ency., 295, 298; 6 S. C., 102; *ex parte* Trenholm, 19 S. C.; 1 Johns. Ch., 590; 2 Kent. Com., 305 (5 ed.); 4 DeS., 516; 46 S. C., 193; 51 S. C., 38; 32 S. C., 595; 52 S. C., 391; 57 S. C., 162.

*Mr. Samuel Dibble,* also contra (argues facts).

August 20, 1901. The opinion of the Court was delivered by

MR. JUSTICE GARY. The record contains the statement that this action was commenced by the plaintiffs on the 25th day of November, 1896, against Benjamin A. Yon, as guardian of the plaintiffs, Minerva C. Phillips, Frances A. Corbett, Allen U. Jeffcoat, and of their brother, Paul D. Jeffcoat, who died before the commencement of this action. The widow and adult children of Paul D. Jeffcoat, deceased, are made parties plaintiffs, and the minor children are made defendants. After the commencement of the action, the defendant, Benjamin A. Yon, died, leaving of force his last will and testament, which was duly admitted to probate, and Ollin C. Salley and Holly J. Salley, the executors therein named, qualified and are now such executors. The summons and complaint of the plaintiffs were thereupon amended; and said executors and the widow, Anna M. Yon, and Benjamin T. Yon, the only child of the testator, were all made parties defendant, and the action was continued, as though these persons had been original parties. The executors filed to the amended complaint substantially the answer filed by the said Benjamin A. Yon. The widow, Anna A. Yon, and also the child, Benjamin T. Yon, answered the amended complaint. The latter being an infant, answered by his guardian *ad litem,* filing a formal infant's answer.

On notice served by the attorneys representing Benjamin A. Yon, his testimony was taken *de bene esse.*

The special referee, Andrew C. Dibble, after a general statement of the case, finds the facts and reports his conclusions of law as follows:

"During the early part of 1860, Benjamin A. Yon was duly appointed the guardian of the persons and estates of the plaintiffs, Minerva C. Phillips (then Minerva C. Jeffcoat), Frances A. Corbett (then Frances A. Jeffcoat), and Allen U. Jeffcoat, and also of Paul D. and Samuel B. Jeffcoat, all of whom were then minor children of Urbane E. Jeffcoat, who died about the year 1858; and upon such appointment the said Yon duly qualified as such guardian, and assumed the management of the estates of said minors. The proceedings bearing upon the said guardianship were destroyed with the public records at the time of the raid of Sherman's army through this State in 1865, and it has, therefore, been necessary to resort to other methods of proof concerning the guardianship. That the appointment was in the early part of 1860, is evidenced by the fact that Minerva C., who was the eldest of the children, was a month or two over fourteen years old at the time, and she was fourteen in January, 1860. It would seem also that the appointment was made by the court of equity, in which at the time a suit was pending for a partition of the lands of the said Urbane E. Jeffcoat, and in which suit was also necessarily involved a complete settlement of all the affairs of the estate of said Urbane E. Jeffcoat. This was not an unusual proceeding for that Court, which had the jurisdiction to appoint guardians for minors in cases before it; and in this particular case, Charles B. Glover, Esq., the office clerk of the commissioner in equity, mentions significantly the 'occasion when we desired to fix the amount of the bond of the guardian of the children of Jeffcoat.' Besides this, the only return made by Yon, as guardian, since the war, was made to the commissioner in equity in 1866, and from

his own testimony it appears that his impression was that he was appointed by the Court of Equity.

"The next question to be determined is as to what assets or property, if any, came into the hands of the said guardian, as a part of the estate of his said wards, or, to push the inquiry further, was there any assests or property which he did not receive for his said wards, because of failure on his part to exercise proper diligence in their behalf. These inquiries will not at present touch upon that branch of the case which concerns the real estate bid off by Yon at the sale of the lands of the estate of Urbane E. Jeffcoat, the father of said wards, as it is deemed better to consider the questions made respecting the said real estate separately. It will be remembered, that at the time of his assuming the guardianship, the estate of Urbane E. Jeffcoat, the only source from which it is contended that his wards were to receive property, was in course of settlement in a case then pending in the court of equity, and that this case had not been concluded, nor had all the debts been paid, at the close of the war in 1865. The personal property of the estate in the hands of the administrator, though large and exceeding $13,000, was insufficient to pay the debts of the deceased intestate, and this fact was known by the administrator, and was set up by him in said suit, and under these circumstances it is not probable that he would have paid any of the funds in his hands or delivered any of the property of the estate to the guardian, for in the suit then pending it was necessary that he should account for his administration, and an improper disposition of any of the assets in his hands would not have been sustained. I think, therefore, that it is clear that nothing was paid by Livingston, the administrator, to the guardian, Yon, for his wards. Nor is there any evidence that Yon was paid any of the cash received by the commissioner on the sales made by him of the real estate. Nor under the circumstances should Yon be blamed or held accountable in any way for losses of assets belonging to the estate of Jeffcoat, by either the administrator or commis-

sioner in equity, for the court of equity had assumed the control and settlement of the affairs pertaining to the property of the estate, and the guardian could only await the action of that tribunal, and receive what it should direct be paid to him for his wards.

"And now as to real estate bid off by Benjamin A. Yon at the sale had by the commissioner in equity, under the orders of the Court in the case above alluded to, for the partition of the real estate of Urbane E. Jeffcoat and the settlement of his estate. As to this land, it is claimed by the plaintiffs that Benjamin A. Yon purchased the property and took title therefor in his own name, and paid the purchase price by receipting to the commissioner for the same upon the distributive shares of his wards. Yon admits his purchase of the property in question, and that he received title thereto in his own name, but contends that he complied with the terms of sale by paying the cash payment from his own funds, and giving bond and mortgage to secure the credit portion, which he also afterwards paid with his own money. He is inaccurate, however, as to many of the details of the transaction. A portion of the lands was sold in April, 1860, and a part in July of the same year. He says that he bought at the first sale—it is conclusively shown that it was the last, in July, when he purchased. He says the terms of sale were one-half cash, and the balance on twelve months time, whereas, the best evidence we have as to this, is the bond of Edward Argoe, taken at the same sale, and which in connection with Argoe's testimony in the case of Dibble, admr., *v.* Holman, admr., *et al.,* shows that his purchase at the sale amounted to $3,400, and he paid in complying with his bid about $251, to pay expenses of sale and papers, and gave his bond and mortgage and personal security for the balance, which amounted to $3,163.96, which was payable in three equal annual instalments payable on January 2d of the years 1861, 1862 and 1863, respectively. This is the only testimony which we have as to the terms of sale for the July sales, outside of the statement of Yon above mentioned; and

there has been no explanation given why Yon should be required to pay one-half cash and give bond payable in one year thereafter, while Argoe complied with the terms of the same sale by paying cash sufficient to pay expenses of sale and papers, and giving bond and mortgage, with personal security, for the balance, payable in one, two and three years. The terms of the sales in the same case in April, were one-third cash and the balance in one and two years, and it is not strange that in July they should be easier for purchasers; but it is inconceivable that the decree of the Court should provide different terms of sale for the two tracts bid off by Argoe and Yon, respectively, on the same salesday. And it would seem that if Argoe and Yon were dealing with the commissioner upon the same footing in respect to the parcels respectively bid off by them, that they would have both been treated the same. Certainly the commissioner would not have discriminated so heavily against Yon, who had an interest in the sale by reason of his guardianship of the minor children of Urbane E. Jeffcoat. But Yon insists that he paid $500 in cash, and gave his bond and mortgage for the balance, which he further says that he paid in about one year to the commissioner, Jamison, himself, in confederate money. This it will be observed was not even a compliance with the terms of the sales in April, when Yon claims he made his purchase. But it is proven that confederate money was not in circulation until September, 1861, and not in general use until 1862, and the testimony also shows that at the time he claims to have paid his bond and mortgage to Col. Jamison, that the latter was in Virginia, and the office was in charge of Mr. Glover, his clerk; and Mr. Glover says, that he does not remember seeing any confederate money until 1862, and his impression is that he received no confederate money while acting as clerk for the commissioner, and further that he attended to the general business of the commissioner's office for Col. Jamison in 1860, and a part of 1861—up to November, 1861—and during the summer of

1861, he had entire control of the office, Col. Jamison being absent in Virginia.

"It will not be out of place just here to notice the letter of Col. Jamison, the commissioner, which has been admitted in evidence, for it touches upon some of the matters bearing upon the sales made by him of the lands of estate of Urbane E. Jeffcoat or, more properly speaking, the securities taken by him at such sales, and it is claimed that this letter corroborates some of the points of Yon's testimony. But in the light of the evidence of Mr. Glover, the office clerk of the commissioner, which bears upon the same matter, and who was probably more familiar with the details than the commissioner himself, as well as the testimony of Daniel Livingston, the administrator, that no money was paid to him by the commissioner, and also the testimony of Bean touching the payment of his bond, which could not have been settled in confederate money, when it was paid in March, 1861, for no confederate money had been then issued, it is evident that Col. Jamison is mistaken in many of the particulars stated by him as facts; and to read the letter as a whole, it seems clear that he was only giving impressions of a memory which he states himself is very bad, and of matters which, in the main, it appears, had been managed by his office clerk, Mr. Glover, and not by himself.

"But there are other circumstances which the evidence discloses which bear upon Yon's purchase now under consideration. The sales were had under a decree of the Court of Equity in the case of A. E. Gleaton and wife *v*. Paul Jeffcoat and others. The bill in this case was filed January 16, 1860, and it was for partition, as we learn from the deed of the commissioner to Yon. The case, as we have seen, was for a division of the lands of Urbane E. Jeffcoat, deceased. The administrator of his estate, Daniel Livingston, was made a party and answered, and it was made to appear that the personal estate, though large, was insufficient to pay debts. A portion of the real estate of intestate—three tracts—was sold in April, 1860; and the other lands—two

28—61

tracts—excepting 263 acres set off to the widow, was sold July 2, 1860. Previous to the July sales, the said 263 acres was allotted to the widow, Julia F. Gleaton, at an appraisement of $2 per acre, made by commissioners. The administrator, Daniel Livingston, says, 'it was then expected that she would get some money besides from the sale of the lands or to equalize her share—that the widow's share was for her thirds after the debts were paid.' The widow went into the possession of this land set off to her, and it was not sold under any decree in that cause. It was also believed, at the time of the sales of the lands, that it would take about $2,000 to settle the debts which would not be paid by the personal estate. The sales of real estate in April, 1860, amounted to $1,795, and those in the July following to $4,405. With this showing as to the condition of the estate at that time, it is not strange that the Court should authorize the widow to receive real estate to the amount of only $526, upon her distributive share; and having done this for her, it was only just and equitable that the decree should provide for the children of the intestate, from the sales of the real estate, at least a sufficient sum to give them their shares upon a like basis, as to amount, as hers; and when it is remembered that the parties were in a Court of Equity, there can scarcely be any doubt that such a provision was made in favor of the Jeffcoat children. And with this condition of affairs it is easy to understand how Yon, whose bid was $1,005, and within the amount his wards were to receive from the real estate sales to equalize them with their mother, should, instead of drawing the cash from the commissioner, receipt to him for the amount, as guardian of the said wards. But in addition to the circumstances above stated, there is the testimony of several witnesses as to statements and declarations of Yon, made by him at different times, and which bear upon the nature of his purchase of the land in question. It is not necessary to go into the details of this testimony here. To sum them up, these statements and declarations were to the effect, that he settled for the land in question by

receipting to one Jamison for it—that it belonged to the
Jeffcoat heirs—that he could not sell it and make a good title
to it—that if the Jeffcoat children pressed him for the land,
they would recover it.   These witnesses, it may be noted,
were of ordinary intelligence, and some of them could not
write their names; but when their evidence is considered
together with the other circumstances of the case, I am
forced to the conclusion that Yon did comply with his pur-
chase of the 364 acre tract, in dispute in this case, by giving
his receipt, as guardian, to the commissioner, Jamison, for
the amount of his bid, and that he did not pay for the lands
with his own funds.

"The public records of Orangeburg District (now this
county) having been destroyed or lost at the time of the
Sherman raid through this State in February, 1865, it does
not appear that further proceedings, if any, were had in the
above mentioned case of Gleaton *v.* Jeffcoat, after the sales
of the commissioner in 1860.   The widow of Urbane E.
Jeffcoat, who had previous to the war intermarried with
Absalom E. Gleaton, who united with her in filing the bill
in that case, continued to occupy the 263 acres which had
been allotted to her, as has been heretofore stated, and the
close of the war found her still in the possession of this land.
The administrator, Daniel Livingston, having gone into
bankruptcy in 1867, surrendered his administration of the
estate of Urbane E. Jeffcoat, and thereupon his assignee in
bankruptcy, Philander V. Dibble, was duly appointed and
qualified as the administrator *de bonis non* of said estate;
and on August 9, 1869, the said Philander V. Dibble, as
such administrator, filed a bill on the equity side of the Court
of Common Pleas for this county against Elias O. Holman,
administrator of Casper Staley, who claimed to be an out-
standing creditor of said estate, and Daniel Livingston, the
former administrator, and the said Absalom E. Gleaton and
his wife, the widow of the said intestate, and the children of
the said intestate, for the marshaling of the assets of said
intestate's estate, and an accounting from the said Daniel

Livingston of his administration, to call in creditors and for general relief. The proceedings in this case show that the estate at this time was wholly insolvent, but one cannot read the record without being strongly impressed with the view that this condition was the result of the war. Under the decree of the Court in this case, the land which had been allotted to the widow, in case of Gleaton v. Jeffcoat, in 1860, was ordered sold, and the proceeds were applied to debts. The securities taken by the commissioner in that case, on the sales of real estate in 1860, were also collected as far as practicable, and the amount realized paid to creditors; but there was no question made in this case of Dibble v. Holman as to the purchase of Benjamin A. Yon, or as to any amounts or property received by him as the guardian of the children of Urbane E. Jeffcoat.

"In 1866, Yon made a return as guardian of the Jeffcoat children, as has been noticed before in this report. This return was made to the commissioner in equity and was for 1865, and reported no receipts, and only payments to the commissioner for his fees for taking the return. Yon made no return after this, as he was advised by the probate judge that it was not necessary. He did not remember whether or not he made returns during the war. He claims, however, that he paid out considerable sums for the education and maintenance of his wards, and that he also paid for his appointment as guardian—all from his own funds—but he has not made any statement whatever of the amounts. On the other hand, the testimony shows that the children were maintained and supported by their step-father and their mother, and that they received very little education, and in two instances, at least, this was paid for by their mother in bacon and corn.

"One of the before mentioned wards of the said Benjamni A. Yon, Samuel B. Jeffcoat, died when he was about fifteen years old, intestate, and left surviving him as the heirs at law and distributees of his estate, his mother, the before named Julia F. Gleaton, and his brothers and sisters

hereinbefore mentioned.    Julia F. Gleaton is also dead, and left surviving her, her husband, Absalom E. Gleaton, and her children, Minerva C. Phillips, Frances A. Corbett and Allen U. and Paul D. Jeffcoat.    The said Absalom E. Gleaton is also dead, but the testimony does not state who are his heirs and distributees.

"Another of the wards of the said Benjamin A. Yon, and also one of the heirs-at-law and distributees of said Julia A. Gleaton, as well as of Samuel B. Jeffcoat, his brother, namely, Paul D. Jeffcoat, died May 1, 1895, intestate, leaving surviving him as the heirs at law and distributees of his estate his widow, Bartine H. Jeffcoat, and fourteen children, namely, * * * and Lee D. Jeffcoat, the last named of whom died on May 5th, 1895, when an infant, and all the others of said children, excepting the four first named, are minors.    It does not appear that there has been any administration upon the estate of any of the deceased parties above named.

"In September, 1896, the aforesaid Benjamin A. Yon departed this life, leaving of force his last will and testament, and as the devisees of his estate thereunder, his widow, Anna M. Yon, and his son, Benjamin T. Yon, who is a minor.    His said will was duly admitted to probate in the probate court of this county on September 16, 1896, when Olin C. Salley and Holly J. Salley, named therein as executors, duly qualified as such, and are still such executors.

"Upon the facts above set forth, my conclusions are:

"1. That the purchase price of the 364 acre tract described in the complaint having been paid by Benjamin A. Yon receipting as guardian for his wards, the children of Urbane E. Jeffcoat, deceased, for the amount of his bid on the distributive shares of his wards, the said real estate thereupon became impressed with a trust in favor of his said wards. *Richardson* v. *Day,* 20 S. C., 418; 9 Am. & Eng. Ency. L., 148; 10 Am. & Eng. Ency. L., 35, 41, 42.

"2. The contention that the estate of Urbane E. Jeffcoat

was insolvent at the time of the sale of the land, does not, as we have seen, conform to the facts of the case, and can have nothing to do with the questions now at issue. Nor did the case of Dibble *v.* Holman settle any of the questions involved in this case. Yon was not a party to that suit, nor was the matter of his guardianship or the land which he purchased, in any way involved in that action.

"3. The question then is, are the parties now complaining in this suit barred from setting up this resulting trust, which originated in their favor at the time Yon took his conveyance from the commissioner in equity, in 1860. This suit was not commenced until 1896, and it does appear that the parties have been rather tardy in instituting proceedings to assert their rights in this particular. While courts are very indulgent to parties sustaining the relation which these wards did to Yon, in matters of this kind, there must be shown some good reason for such a long delay as has been in this case, before they will sustain and enforce the resulting trust. 10 Am. & Eng. Ency. L., 50; *Billings* v. *Clinton,* 6 S. C., 90.

"4. There can be no doubt, however, under the circumstances of this case, that Yon's estate should be held accountable for the $1,005 as assets of his wards' estates of which he got the benefit when he receipted to the commissioner in equity for the same, and that said amount is chargeable against him as received by him at the time of the sale. *O'Neill* v. *Herbert,* Dudley Eq., 30. He has never been discharged from the guardianship, and lapse of time is no barrier to an accountability. *Nobles* v. *Hogg,* 36 S. C., 327-9; Perry on Trusts, sec. 863.

"5. There should, therefore, be a judgment in this action against the defendants, Ollin C. Salley and Holly J. Salley, as executors of the estate of said Benjamin A. Yon, deceased, for the shares of the parties before the Court and interested in the said $1,005, and interest thereon. The only payment which is established by the testimony is the $5 paid by Yon for his return made in 1866, and this should

be allowed.   As the guardian appropriated the estates of his wards to his own use and expended none of it for the benefit of his wards, and has failed to file his returns regularly, he should be allowed no commissions; and the interest charged every year necessarily compounds.   The said $1,005 with interest added, and deducting the $5 payment, now amounts to $13,094.73.   The plaintiffs, Minerva C. Phillips, Frances A. Corbett and Allen U. Jeffcoat, are each entitled to a judgment for 37-150 of this amount, or $3,229.73, and the estate of Paul D. Jeffcoat, deceased, is entitled to a like amount, to be divided among his heirs at law and distributees according to their rights and interests therein; the widow, Bartine H. Jeffcoat, being entitled to one-third thereof, and the children of said deceased to the remaining two-thirds thereof, to be divided among them equally.   As to the share of Paul D. Jeffcoat, deceased, as there has been no administration upon his estate, it may be well to have the same, or such amount as may be collected thereon, paid into Court, that his creditors, if any, may be called and heard before a distribution of this fund is made. The estate of Absalom E. Gleaton is entitled to the other 2-150 of the $1,005, and interest, but his representatives are not before the Court to receive it.

"6. The costs of the action should be paid by the defendants, Ollin C. Salley and Holly J. Salley, executors as aforesaid, and judgment entered accordingly.".

The decree of the presiding Judge (omitting that part which recites the facts heretofore set forth) is as follows:

"The special referee has so well stated the names of the parties and their relations to each other, and the nature of the contention between them, that it has only been necessary for me to state them briefly; and he has made an able report, but I cannot agree with him as to many of his findings of fact, and especially as to his finding on the main point of the case, which is, whether Benjamin A. Yon paid for the land in controversy, with his own money or receipted for it as guardian.   Yon claims that he paid for it with Confederate

money of his own during the war, and the adverse claimants
contend that he receipted for it as guardian. The special
referee finds that Yon receipted for this land as guardian,
and bases his conclusion, partly, as I understand his reason-
ing, on a conjecture that the Court of Equity, in Gleaton *v.*
Jeffcoat, probably allowed Yon, as guardian, to receipt for
the land, and allowed the widow to have 263 acres set apart
to her, supposing that the condition of the estate warranted
it; and partly on another conclusion, that there was no con-
federate money to pay for the land at the time, and even if
there had been, the commissioner was not in his office to
receive it, but in Virginia, and his clerk cannot recollect
even receiving any confederate money about the time when
Yon says he paid the confederate money; and partly on
another conclusion, that Yon did not purchase at the first
sale, as he contended, but at the second sale; and partly on
the testimony of certain witnesses who testified that Yon
told them at sundry times that he receipted for the land as
guardian. From this, the special referee concludes that
Yon did receipt for the land as guardian.

"After a careful consideration of the facts, I am forced to
a different conclusion. The reasoning by the special
referee is very fine and ingenious, and is the exponent of an
able intellect; and if the same reasoning were applied to
facts instead of conjectures, the result would be well sup-
ported; but such is not the case. As I see it, one supposed
fact is reasoned into existence, and then another supposed
fact is reasoned into existence and put along with the first
one, and so on to the end. Then the alleged admissions
and declarations of Yon are called in to conclude the whole
matter. To my mind, these alleged admissions are about
all the claimants have to stand on, and, aside from the fact
that such testimony is not favored by a Court, the alleged
admissions in this case are properly subject to much adverse
criticism. In the first place, Yon never did mention any-
thing of the kind to his intimate friends, but only to such
persons as were akin or very friendly to the claimants, and

not very well disposed toward himself.   In the next place,
he is alleged to have volunteered this information to these
people, sometimes in connection with business—as, for in-
stance, in a land trade—but invariably in a way which, ac-
cording to the witnesses, would indicate that he rather pre-
ferred than not to make it known to them.   And in at least
one instance he is said to have made this declaration after he
had been sued in this case, and had sworn to the contrary in
his answer.   Then, again, it seems to me strange that all
this occurred so long after the purchase, which was in 1860,
and all these conversations are alleged to have taken place in
1895, or about that time, except one with Richard Peel,
which is said to have occurred in 1875.   From 1860 to
1875 was fifteen years of silence on Yon's part; from 1875
to 1895 there were twenty years of silence.   Then he talked
very freely, according to the parties, and very soon after-
wards this action was commenced.   I noticed from the date
of his examination, that Yon's testimony was taken in
1896, before any of these witnesses were sworn in the case,
and he died before they were examind.   As to this kind of
testimony, the Court, in *Billings* v. *Clinton,* 6 S. C., 102,
uses this language: 'Although parol testimony is admitted to
establish a trust thus resulting, nevertheless, to divest one
of a legal title and confer it on another, it will not avail,
unless it is clearly sufficient for the proposed end.   Testi-
mony which, while it may induce doubt, does not satisfy
the mind of the actual existence of the fact necessary to
establish such trust, will not be enough.   The payment of
the purchase money on which the claim depends must not
be made out by conjecture, but by circumstances which show
the fact.   If they are loose and equivocal, they will not suf-
fice.   See Lewin on Trusts, 206; Hill on Trusts, 94; Sug-
den on Vendor and Purchasers, 174.'   The Court then con-
tinues: 'Conceding to the witnesses who testify to the decla-
rations of Minor, the fullest credibility, testimony of that
character is not favored by the Courts.   Mr. Sugden says:
* * * 'when the evidence is merely parol, it will be received

with great caution. Evidence of naked declarations made by the purchaser himself is, as Sir William Grant observed, in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of a declaration.' Thus far I have considered almost exclusively the testimony of the claimants, which, in my opinion, makes at most a very doubtful case—too doubtful to produce conviction. On the other hand, the defendants introduce the direct testimony of Yon, that he did not receipt for the land, but paid for it with his own money, and explains how he raised the money by selling a tract of land to one Salley. Then there is the evidence furnished in Dibble *v.* Holman. That case was supplemental to the case of Gleaton *v.* Jeffcoat. Both of these actions were brought to settle up the estate of U. E. Jeffcoat. In the case of Dibble *v.* Holman, a very searching investigation was made, and all matters unsettled were considered and adjudicated. The administrator of U. E. Jeffcoat, Mr. Livingston, was examined as a witness concerning his estate. Argoe, a purchaser of real estate, was examined and testified concerning the purchase of the land in dispute by Yon, giving number of acres and amount of bid by Yon. Jamison, the commissioner, was written to and responded, mentioning specifically that B. A. Yon paid for his land in full. Charles B. Glover, the clerk of the commissioner, was the referee in Dibble *v.* Holman and made the report in the case. There was certainly a full opportunity in that proceeding for a thorough examination of all matters relating to U. E. Jeffcoat's estate, and I am convinced that everything was fully investigated. The land which had been set apart to the widow in the case of Gleaton *v.* Jeffcoat was taken and sold; and if Yon, in that case, had been allowed to receipt as guardian for his wards, under the supposition that there would be that much going to the wards, then, notwithstanding the receipt, when the Court ascertained that the estate was insolvent, and

would need that tract also to pay debts, it would have treated it as it did the widow's. This was impossible, however, if Yon did as he testified that he did, to wit: paid the bid with his own money; and we find that this tract was not interfered with. Yon himself was not overlooked, because he was surety for the widow and was sued, and that appeared in Dibble *v.* Holman. Nor was his purchase overlooked, because Argoe testified about it as a witness before the referee, C. B. Glover. In this connection it must be borne in mind that this case of Dibble *v.* Holman was instituted not quite ten years after the purchase of Yon, when all these transactions were fresh in the minds of all the parties, and, further, that the same persons who are claimants in this action were parties to that action. The Court, in that case, adjudged that the widow was entitled to one-third and the children (the claimants here) to two-thirds, after the debts were paid. If the children had received $1,005, no such order could have been made, after selling the widow's 263 acres, as the Court did in that case. Having taken away and sold the widow's land, the Court would first have made up her share in proportion, and then have distributed the balance, one-third to the widow and two-thirds to the children. I am, therefore, forced to the conclusion, that Yon's indebtedness to the estate, and whether he received anything on account of his wards, was actually examined into and considered. Besides, B. A. Yon, after the war, at one time made an annual return as guardian to the commissioner in equity, covering several years. The report is in the handwriting of Commissioner Jamison, and is sworn to by B. A. Yon. This was during the existence of the Court of Equity as a separate Court, and during the pendency of Gleaton *v.* Jeffcoat, the assets of which were then in charge of the commissioner. The commissioner prepared the report, showing no receipts or expenditures on account of his wards—a return the commissioner could not have made, had Yon been in receipt of the purchase money for the land and chargeable with the interest thereon.

"I am, therefore, of the opinion that B. A. Yon paid for the purchase of the land in question with his own money, and that he did not at any time receive anything on account of his wards; and it is so ordered, adjudged and decreed. It is further ordered, adjudged and decreed, that the complaint herein be dismissed, and that the plaintiffs, and those of the defendants who joined with them, pay the costs of this action."

The principal question of fact that was in issue is, whether Benjamin A. Yon paid the purchase money of the land which he bought in July, 1860, by receipting to the commissioner in equity for the distributive shares of his wards to that extent. It seems to have been the general impression when the lands were sold in 1860, that the proceeds arising therefrom would be more than sufficient to pay the debts, and that a considerable sum would remain for distribution between the widow and children of Urbane E. Jeffcoat. Acting on this belief, the administrator, Daniel Livingston, made advancements in behalf of the estate in excess of its assets, and a tract of land was allotted to the widow as a part of her share in the estate. It is but reasonable to suppose that Benjamin A. Yon and the commissioner entertained the same belief. These and other circumstances which we do not deem it necessary to mention, in view of the elaborate and well considered report of the special master, force upon us the conclusion that his finding upon this fact should have been sustained.

We will next consider the effect of the judgment hereinbefore mentioned. In his decree, the presiding Judge thus states the history of the case in which it was rendered: "In 1859 or in 1860, Absalom E. Gleaton and Julia, his wife, filed a bill in the Court of Equity against the children of the intestate, for partition of the lands of the estate, making the administrator, Daniel Livingston, a party, who answered, alleging that the personal assets, amounting to some $13,000, were insufficient to pay the debts of the estate. * * * After the war, the estate of U.

E. Jeffcoat was still unsettled, and the administrator, Daniel Livingston, became a bankrupt on his own petition, and retired from the administration, claiming to have expended more than the personal assets of U. E. Jeffcoat in paying his liabilities, having expected reimbursement from the real estate. P. V. Dibble was appointed his assignee in bankruptcy, and also took out letters of administration *de bonis non* of the estate of Urbane E. Jeffcoat, of which he claimed to be a creditor as assignee in bankruptcy of Livingston, and in the year of 1869, as such administrator and assignee, filed a supplemental bill to settle the estate of Urbane E. Jeffcoat, making Holman, a creditor, and the distributees, and the late administrator, Daniel Livingston, parties to the suit. In that case the estate assets were marshaled, the remaining tract of 263 acres of land was sold, and the proceeds, with such sums as were realized from collections by suit of the unsettled bonds and mortgages of purchasers of land, and of some of the sale notes of personal property, were applied to the payment of the creditors of the intestate. The final judgment in the case of Dibble *v.* Holman provided that, after creditors had been paid, if there should be any surplus, it should be distributed, one-third to the widow, Julia Gleaton, and two-thirds to the guardian of the children, who were still minors. But the assets were insufficient to pay even the specialty creditors, who received only a small percentage of their claims as proved." There are also other statements in that part of the decree hereinbefore set out, which relate to the settlement of said estate.

We do not deem it necessary to discuss the proposition argued by the appellant's attorneys, that the proceedings to marshal the assets and settle the estate of Urbane E. Jeffcoat were *in rem,* and that the judgment was *res judicata* as to all persons having an interest in the settlement of the estate, though not formally made parties to the record. Even if Benjamin A. Yon should be regarded as a stranger to the proceedings, the judgment was nevertheless admissible in evidence for certain purposes. In 7 Enc. of Law

(1st edition), 76, it is said: "All judgments whatever are conclusive proof as against all persons of the existence of that state of things which they actually effect when the existence of the state of things so effected is a fact in issue, or is, or is deemed to be, relevant to the issue." The Court, in *Koogler* v. *Huffman,* 1 McC., 495, thus states the rule: "In the argument below, it was contended that the decree and proceedings in the Court of Equity ought not to be given in evidence, because the defendant was not a party to them; and the general doctrine that judgments cannot be given in evidence, except between parties and privies, was relied on. As to this form of objection, the law is clear, upon any collateral matter, any judgment or decree may be introduced. All that is meant by the rule is that the rights of a party cannot be determined on conclusively, unless he be a party"—citing, Phillips, 226; Gilbert, 54; Buller, N. P., 244; 2 Espinasse, 457.

The children of Urbane E. Jeffcoat, of whom Benjamin A. Yon had been appointed guardian, were made parties to the proceedings to marshal the assets and settle the estate of their deceased father. Some of the children were *sui juris* when the estate was settled. They had notice of the report of C. B. Glover, referee, in which he says: "The proceeds of the bonds and mortgages of the purchasers of said real estate, and the tract of land on which the widow now resides, constitute the present assets of the estate * * * The complainant has accounted to me as administrator *de bonis non,* and has in hands as such a cash balance on the first day of April, A. D. 1871, of $781.06, and securities and investments amounting with such cash balance to about $2,100, and these constitute the present assets of the estate. The accounts of the two administrators and a statement of the assets accompany this report. Under the orders of the Court calling in creditors of the estate by advertisement, the following claims have been duly proven against the estate of the said Urbane E. Jeffcoat, deceased, viz: * * * Under the head of first, 'pre-

ferred claims,' they amount to $300. Under the head of 'second, specialty claims,' they amount to $5,673.25. And under the head of 'third, simple contract claims,' they amount to $581.92."

They also had notice of the decree of the Circuit Court confirming the said report, and of the order of the Court: "That the complainant, P. V. Dibble, do pay over to the clerk of this Court the sum of $781.06, and turn over to him, also, the securities reported in this case as assets of said estate, and that he be then discharged from any other or further accounting for his administration of the estate of the said Urbane E. Jeffcoat, deceased." They had notice, likewise, of what was apparent upon the face of the proceedings, that the estate was hopelessly insolvent. Under the terms of the decree they knew that they were not entitled to any portion of the proceeds arising from the sale of the property, until the debts were paid in full, or the assets exhausted in such payment. They either knew or by the exercise of due diligence could have known that Benjamin A. Yon bought one of the tracts of land at public outcry, and they either knew or by exercising due diligence could have known what became of the proceeds. It should have excited inquiry, that the bond and mortgage of Benjamin A. Yon was not reported among the assets of the estate. It should, likewise, have aroused inquiry as to what had become of the proceeds, when one of the specialty claims reported by the master was that of P. V. Dibble, assignee in bankruptcy of D. Livingston, former administrator, for balance due on moneys expended for the estate in excess of receipts, amounting to $3,315.30. Under these circumstances it was the duty of the children to have brought to the attention of the Court that there were outstanding assets which, in justice and equity, were first applicable to the payment of the debts. Whether the failure to discharge such duty arose from intention or negligence, it was, nevertheless, an act of wrong. They are now seeking through the aid of a Court of Equity to have applied to their claims

against their guardian, assets of the estate to which in morals and equity they have no right. They would thus be taking advantage of their own wrong. This Court does not decide that Benjamin A. Yon or his estate has a better right to the money for which he receipted than his wards, but that it will not, under these circumstances, lend its aid. It simply leaves the parties where it finds them. We apply this doctrine more readily on account of the great lapse of time since the transaction took place.

These views render unnecessary the consideration of the other questions presented by the exceptions.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE JONES *concurs in the result.* MR. JUSTICE POPE *dissents.*