## 12427

### FITCHETTE *ET AL.* v. SUMTER HARDWOOD CO. *ET AL.*

#### (142 S. E., 828)

1. CONTINUANCE—MATTER OF CONTINUANCE IS IN DISCRETION OF TRIAL JUDGE.—Matter of granting or refusing continuance is in discretion of trial Judge.

2. CONTINUANCE—COURT PROPERLY DENIED CONTINUANCE OF LIBEL SUIT UNTIL DETERMINATION OF SUIT BETWEEN PARTIES, IN WHICH TRUTH OF DEFENDANTS' STATEMENTS REGARDING MATTERS THEREIN INVOLVED WOULD BE DETERMINED.—Where defendants, without waiting outcome of a suit against plaintiffs to recover an alleged indebtedness growing out of certain business transaction, made statements claimed by plaintiffs to be libelous regarding matters involved therein, and defendants claimed statements were true as defense in libel suit, Court did not abuse discretion in denying continuance of libel suit until previous suit was determined, in order to determine truth of statements.

3. LIBEL AND SLANDER—WHETHER ALLEGED LIBELOUS LETTER WAS SENT TO PARTY INDIVIDUALLY, OR AS REPRESENTATIVE OF BANK WITH WHICH PLAINTIFFS WERE TRYING TO ESTABLISH CREDIT, HELD FOR JURY.—In libel action, whether copy of alleged libelous letter was sent by defendant to C. individually, or as representative of bank with which plaintiffs were trying to establish credit, *held* for jury.

---

NOTE: As to burden of proof of actual malice in action for libel and slander, see annotation in 26 A. L. R., 852; 17 R. C. L., 418; 3 R. C. L. Supp., 681; 4 R. C. L. Supp., 1130; 5 R. C. L. Supp., 944.

On admissibility of judicial records to show rendition and effect of judgment, see 10 R. C. L., 1116; 2 R. C. L. Supp., 1153; 6 R. C. L. Supp., 637; 7 R. C. L. Supp., 345.

On the rule that actual damages be found or recovered to permit the imposition of punitive damages, see 33 A. L. R., 414; 8 R. C. L., 593; 4 R. C. L. Supp., 564; 5 R. C. L. Supp., 478; 6 R. C. L. Supp., 518.

## 54   FITCHETTE *et al. v.* SUMTER HARDWOOD CO. *et al.*

4. LIBEL AND SLANDER—EVIDENCE REGARDING TRANSACTIONS BETWEEN PLAINTIFFS AND BANK, WITH WHICH PLAINTIFFS WERE TRYING TO ESTABLISH CREDIT, AND WHICH RECEIVED· COPY OF ALLEGED LIBELOUS LETTER, HELD PROPERLY ADMITTED.—In action for damages on account of alleged libelous letter, in which evidence made question for jury as to whether copy of alleged libelous letter was· sent to C. as representative of bank, with which plaintiffs were trying to establish credit, or to ·C. individually, evidence regarding transactions between plaintiffs and bank *held* properly admitted.

5. JUDGMENT—JUDGMENT IS ADMISSIBLE TO PROVE FACT WHICH FROM ITS NATURE IS PROVABLE BY EVIDENCE OF GENERAL REPUTATION, OR TO PROVE COLLATERAL FACT.—A judgment is admissible as proof of fact which from its nature is provable by evidence of general reputation, or for purpose of proving merely collateral fact.

6. JUDGMENT—JUDGMENT IS ADMISSIBLE TO PROVE FACT OF RENDITION AND LEGAL CONSEQUENCES.—A judgment is admissible to prove fact of its rendition and its legal consequences.

7. APPEAL AND ERROR—IF JUDGMENT ROLL IN ANOTHER SUIT WAS ADMISSIBLE TO PROVE ITS RENDITION, ERROR IN EXCLUDING IT WAS CURED, WHERE PLAINTIFF TESTIFIED WITHOUT OBJECTION THAT JUDGMENT WAS OBTAINED AGAINST THEM.—Where defendants in alleged libelous letter had stated plaintiffs did not have ability to carry out contract, and plaintiffs later entered into similar contract with C., and C. sued plaintiffs for alleged damages arising from failure of plaintiffs to carry out terms of contract, if C.'s judgment roll was admissible to show fact that judgment had been rendered in favor of C. against plaintiffs, error in excluding it was cured by fact that one of plaintiffs testified without objection that C. had brought suit against them on contract and obtained judgment against them. ·

8. APPEAL AND ERROR—EVIDENCE—IN LIBEL ACTION, EXCLUDING JUDGMENT ROLL IN SUIT BY ANOTHER PARTY AGAINST PLAINTIFF, OFFERED AS ADMISSION OF TRUTH OF LIBELOUS LETTER, HELD NOT ERROR, AND IN ANY EVENT NOT PREJUDICIAL, WHERE IT CONTAINED NO ADMISSION.—Where defendants had stated in alleged libelous letter that plaintiffs did not have ability to· carry out lumber contract which parties were contemplating making, and plaintiffs later entered into similar contract with C. Company, and C. Company sued plaintiffs for alleged damages arising from failure of plaintiffs to carry out terms of contract, exclusion, in libel action, of C. Company's judgment roll offered to show admission by plaintiffs during progress of cause, *held* not error, and in any event, not prejudicial, where judgment roll as offered contained no admission by plaintiffs tending to· show inability to perform their contract.

9. LIBEL AND SLANDER—IN LIBEL SUIT, DEFENDANT MUST SHOW THAT COMMUNICATION, CLAIMED PRIVILEGED, WAS MADE IN GOOD FAITH,

AND WAS PRIVILEGED AS MADE.—In libel suit, it is not enough for defendant to show that occasion was one of privilege, but it must also appear that communication itself was made in good faith, and was privileged as made.

10. LIBEL AND SLANDER—WHERE OCCASION IS PRIVILEGED, BURDEN IS ON PLAINTIFF TO SHOW MALICE IN WRITING ALLEGED LIBELOUS LETTER. —Where occasion is privileged, there is *prima facie* presumption to rebut inference of malice, and burden is on plaintiff to show malice in fact in writing alleged libelous letter.

11. LIBEL AND SLANDER—WHETHER ALLEGED LIBELOUS LETTER, SENT TO BANK, HAVING MORTGAGE ON TIMBER, STATING PLAINTIFFS WERE INCAPABLE OF CARRYING OUT PROPOSED TIMBER CONTRACT, WAS QUALI- FIEDLY PRIVILEGED, HELD FOR JURY.—In action for damages on ac- count of alleged libelous letter, copy of which was sent to bank holding mortgage on timber, which letter stated that plaintiffs did not have ability to carry out proposed lumber contract, when plain- tiffs were trying to establish credit with bank, question whether letter was qualified privileged *held* for jury.

12. APPEAL AND ERROR—FAILURE TO CHARGE JURY THAT OCCASION WAS PRIVILEGED HELD NOT PREJUDICIAL ERROR, WHERE BURDEN WAS LAID ON PLAINTIFFS TO PROVE MALICE IN ANOTHER CHARGE.—In ac- tion for damages on account of alleged libelous letter, failure to charge jury that occasion was privileged *held* not prejudicial error, since only effect of such charge would have been to lay on plaintiffs burden of proving express or actual malice, and such burden was laid by charge that malice on part of defendants in writing letter was necessary to make out case for damages for libel, and must be shown by preponderance of plaintiffs' testimony.

13. LIBEL AND SLANDER—IN DECIDING WHETHER DEFENDANTS WROTE LIBELOUS LETTER WITH ACTUAL MALICE, JURY COULD HAVE RECOURSE TO LANGUAGE OF COMMUNICATION AND TO EXTRINSIC EVIDENCE.—In action for damages on account of alleged libelous letter, jury, in deciding question as to actual malice, could have recourse both to language of communication itself and to extrinsic evidence.

14. LIBEL AND SLANDER—TRUTH OF ALLEGED LIBELOUS STATEMENTS IN LETTER HELD FOR JURY, WHERE EVIDENCE WAS CONFLICTING.—In ac- tion for damages on account of alleged libelous letter, in which truth of statements contained in letter was pleaded as justification, issue was for jury, where evidence was conflicting.

15. LIBEL AND SLANDER—VERDICT FOR PUNITIVE DAMAGES ONLY HELD NOT WITHOUT FOUNDATION, WHERE ACTUAL DAMAGES ARE PRE- SUMED FROM USE OF WORDS LIBELOUS PER SE.—Verdict for punitive damages only in action for libel *held* not without foundation, where damages are presumed from use of words libelous *per se*, stating that contractor did not have inclination and ability to perform contract, and other elements of libel were shown.

16. TRIAL—INSTRUCTION THAT HONEST OPINION OF WRITER OF DEFAM-
ATORY MATTER WAS COMPLETE JUSTIFICATION HELD PROPERLY RE-
FUSED.—Instruction presenting to jury, as alternative justifications
of defamatory letter, truth of statements therein contained and
honest, but erroneous, opinion of writer, *held* properly refused,
since to tell jury, without more, that honest opinion of writer of
defamatory matter is complete justification therefor, would · take
from jury question of malice, and would be error.

17. TRIAL—INSTRUCTION IN LIBEL ACTION, CONTAINING STATEMENTS
EQUIVALENT TO FINDING THERE WERE MITIGATING CIRCUMSTANCES,
HELD PROPERLY REFUSED.—Instruction in libel action that, should
jury not find that writing was entirely justifiable, they could not
consider that a circumstance in aggravation, but should, on the
other hand, take into consideration all mitigating circumstances
·surrounding the transaction, *held* properly refused, since it was
equivalent to saying that there were mitigating circumstances.

Before WILSON, J., Sumter, July, 1925.   Affirmed.

Action by George P. Fitchette and another, individually
and as George P. Fitchette & Son, against the Sumter Hard-
wood Company and another.   From a judgment for plain-
tiffs, defendants appeal.

*Messrs. Lee & Moise,* for appellants, cite:  *As to imputa-
tion of agent's knowledge to principal:* 132 S. C., 340,
345.   *In libel cases truth can be.pled and proven as a justi-
fication, even though defendant did not know at time of pub-
lication that he was speaking the truth, if such truth subse-
quently established:* 17 R. C. L., 325; 115 U. S., 363; 92
S. C., 185; 44 S. C., 19; 30 S. C., 578; Ann. Cas., 1914-B,
838.   *Privileged communications justified:* 17 R. C. L.,
341; 119 S. C., 237.   *Same, question of law where facts
and circumstances surrounding publication are undisputed:*
116 S. C., 90; 138 S. E., 112.   *Truth is a complete defense:*
Sec. 426, Code Proc., 17 Ann. Cas., 761; Ann. Cas., 1918-C,
335.   *"Account was much overdrawn," not actionable per
se:* 130 S. C., 533; 138 S. C., 47.   *"Publication":* 76 S. C.,
510; 116 S. C., 77; 134 S. C., 198; 122 S. C., 350.   *"Ac-
tionable libel":* 114 S. C., 48.   *Express malice, or malice
in fact necessary to recovery in .case of communication
known as qualifiedly privileged:* 17 R. C. L., 323.   *Same,*

*necessary· to recovery of punitive damages:* 37 C. J., 125. *Same, never presumed:* 17 R. C. L., 417.

*Messrs. Epps & Levy,* and *Harby, Nash & Hodges,* for respondents, cite: *Justification in part, is no valid defense to libel:* 145 S. C., 196. *Those not parties to a judgment not bound thereby:* 15 R. C. L., 1008; 105 S. C., 86; 114 S. C., 207; 1 Greenleaf on Ev., Sec. 154. *Charges were in part libelous per se, and were presumed to be false:* 37 C. J., 85. *Whether or not presumption rebutted, question for jury:* 87 S. C., 174; 118 S. C., 153. *Question of privilege properly submitted to jury:* 119 S. C., 24. *Direct and presumptive evidence of malice to go to jury:* 3 Hill, 85; 36 C. J., 1216. *Where requested charge confuses bad with good law, trial Judge may refuse request outright:* 52 S. C., 224; Id., 472; 101 S. C., 409; 102 S. C., 57; 45 S. C., 146; 16 S. C., 435.

April 12, 1928.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is an action for damages on account of an alleged libelous letter written by C. F. Korn, president of Sumter Hardwood Company, to J. C. Bruton, of Columbia, S. C., under date of February 23, 1924; a copy of the letter being sent to W. A. Clark, of Columbia, S. C.

The plaintiffs are partners engaged in the logging business. In 1921, they entered into a contract with Sumter Hardwood Company, for the logging of certain timber, which contract continued in effect, with minor changes, until December, 1923. At the time of its expiration the Fitchettes were indebted to the company, and the company agreed to take over in the settlement certain equipment and supplies belonging to them, but a disagreement arose between the parties as to the value to be placed upon these articles and as to certain items of charge and credit. This controversy resulted in a lawsuit, instituted by the company, wherein the Fitchettes set up certain counterclaims, and which was still pending at the time of the trial of the present suit.

Early in the year 1924 the Fitchettes entered into negotiations looking to the purchase and logging of certain timber in Richland County, known as the Segars timber, which was under contract of sale to J. C. Bruton of Columbia, S. C., subject to certain incumbrances. Bruton had previously made a contract with Sumter Hardwood Company to sell it certain of the output of logs from the Segars timber at the price of $14 per thousand feet. Bruton was indebted to the Carolina National Bank, which held a mortgage of the timber, and also to W. A. Clark, then chairman of the Board of Directors, and formerly president of the bank. For financial reasons Bruton was unable to perform his Segars contract, and his negotiations with the Fitchettes followed. In order that the proposed sale to the Fitchettes might be consummated, satisfactory arrangements with the parties having an interest in the Segars timber were sought to be made, and on February 4, 1924, Clark wrote to the Hardwood Company, advising that in his opinion Bruton was utterly unable to execute the Segars contract, but that Bruton thought he could interest another party in the purchase of the timber included in the company's contract, and so render the standing timber on the Segars tract available, and inquiring whether the company would be willing to cancel its contract with Bruton, so as to allow him to contract with the other party. About ten letters on the subject were exchanged between the Company and Clark.

On February 12, the Company, through Korn, its president, wrote Clark as follows:

"If we can enter into some arrangement whereby we can be sure of obtaining a million feet or more of this class of raw material for our Sumter mill, we believe we would be willing to give our consent to letting other parties operate this timber."

On February 13, Clark wrote Korn, advising that he had prepared a form of contract to be executed by Bruton and the parties with whom he wished to contract for the sale of

the timber, and inclosed a copy of a section of the contract providing that the "party of the second part" should sell and deliver to Bruton, or such other person as he might name, 1,000,000 feet of logs at the current price, etc.

In a letter dated February 16, the Company, through Korn, wrote Clark as follows:

"Before closing the detail of any new arrangements, we would like to discuss it with all interested parties. A contract is of little value, unless both sides have the ability and the inclination to perform their respective parts. If the parties are not entitled to our confidence, we prefer to let the matter stand as it is. * * * We stated to you that nothing could be gained by talking to Mr. Bruton alone, and we wanted to know who we were dealing with. Where the questions of price, grade, measurement, etc., are to be daily dealt with, we must know who we are trading with. If the parties are acting in good faith, why should they wish to remain concealed in the background, while these negotiations with us are going on?"

By a contract dated February 14, Bruton attempted to sell the Segars timber to the Fitchettes, the contract containing the provision that the Fitchettes should sell and deliver to Bruton, or such other person as he might name, 1,000,000 feet of the logs at the current price at the date of sale and shipment. On February 19, Clark wrote a letter to the company, detailing the circumstances relied upon as showing Bruton's inability to deliver Segars timber to the company in accordance with his contract, and advising, at least by inference, that Bruton had made a contract of sale of the timber, adding:

"Under all the circumstances, I believe that your interest has been conserved and protected, and I trust that it will meet with your approval."

On February 20, the Company, through Korn, wrote Clark as follows:

"As we stated before, we are willing to co-operate with Mr. Bruton, but we want some assurance of good faith before we waive any of our rights under the Bruton contract. If we consent to take 1,000,000 feet of logs and release Bruton from further obligation, we want to know who is going to furnish these logs to us; also at what price and when. We have asked for this information before, but for some reason the information is withheld. Bruton has failed to perform his contract, and we are writing him today as per inclosed copy of letter."

On the same day, the Company, through Korn, wrote to Bruton as follows:

"Information has just reached us that you have arranged with some parties to operate your upper timber tract. At Mr. Clark's request, we sent Mr. Barringer over to your office for the express purpose of meeting the parties and talking it over. For some unknown reason, the parties did not meet us, nor have you seen fit to tell us who they are. We are disposed to co-operate with you in your efforts, but we want assurance of good faith before we consent to any change in our original contract with you. If we consent to any modification of your contract, we must know who the parties are that are going to deliver us logs; also at what price and when deliveries are to be made."

In a letter dated February 21, Bruton wrote the Company as follows:

"Your letter of February 20th just received, and will say in reply that the parties that I am trading with are Fitchette & Son. You know these people well enough to be assured that they will get the 1,000,000 feet of logs. So far as I was concerned, I had no objections to you knowing who the parties were, but they told me for certain reasons they did not want me to give their names, and I promised that I would not say anything as to that. This is the reason that I did not give their names, and then, too, I did not see that

it would be essential to you, as you were trading with me, and not with them."

On February 23, the Company, through Korn, wrote to Bruton the alleged libelous letter, sending a copy thereof to Clark. This letter is as follows:

"Referring to your letter of February 21, advising us that Fitchette & Son are the parties to whom you have sold your timber: This is the first information we have had as to who we are expected to deal with in the delivery of logs to us. We are willing to co-operate with you in any plan that will be of our mutual advantage, but our interests must be served as well as yours. It will not be satisfactory to us to deal with Fitchette & Son. They have fallen down on previous contract we had with them. Their account was much overdrawn when they left us, and when it came time for a settlement they totally disregarded their contract. We have lost confidence in them, and do not think they have either the ability or the inclination to carry out any new contract that might be made with them. If you let them go to work getting out pine, stave timber, and hardwood sawlogs off your upper tract, we want every log that will come under our contract dated October 16, 1922, and which is later affirmed and concurred in by the Carolina National Bank in an agreement dated April 30, 1923."

The plaintiffs alleged in their complaint that this letter was written in malice, and that it—

"imputed to the plaintiffs generally, and in their particular business, dishonest and fraudulent practice, motive, and intention, and a want of integrity; sought to bring them, and the manner in which they conducted their business, into disrepute; sought to destroy their reputation for integrity and fair dealing; sought to impair confidence in their character and ability in the conduct of their particular business; and all of which was calculated and intended to injure the credit of the plaintiffs, and was particularly injurious and hurtful to the reputation, character, and standing of plaintiffs as

loggers, purchasers, and handlers of timber; and sought to injure the plaintiffs and defeat them in their purchase of said timber."

The defendants by their answer set up several defenses, which are thus summarized by their counsel:

"(1) A general denial; (2) that the statements in the letter were 'not libelous, but were made in absolute good faith and without malice,' that said statements 'correctly and frankly expressed the experience and opinion which defendants had sustained and formed,' and were true, and that said letter was written '*bona fide* in the discharge of a legal or moral duty rendered necessary by the exigencies and circumstances of the occasion which was one of qualified privilege'; (3) that the letter was a privileged communication, and was neither libelous nor malicious, having been written 'in complete good faith and with an interest to be upheld,' 'on a proper occasion, in a proper manner, and to proper parties only,' and 'in reference to a business transaction, and as part of a correspondence then being had, and was confidential and privileged, and was not intended to be disclosed or published in any manner whatsoever'; and (4) that it was proper that such facts should be stated, and that the same were true."

When the case was called for trial the defendants made a motion for continuance on the ground that the pending suit for accounting between the parties should be decided before the libel case was tried, but this motion was refused. At the close of the plaintiff's testimony a motion for nonsuit was made and refused. At the close of all the testimony the defendants made a motion for a directed verdict, which was also refused. The jury found for the plaintiffs $3,000 punitive damages.

The defendants appeal to this Court upon seven exceptions, alleging error on the part of the trial Judge as follows:

I. In refusing the motion for continuance.

II. In admitting certain testimony and excluding certain other testimony.

III. In refusing to order a nonsuit and to direct a verdict, upon the grounds (a) that the alleged libelous communication was qualifiedly privileged; (b) that the statements therein contained correctly expressed the writer's experience and honest opinion and were true; (c) that there was no evidence of malice, express or implied; and (d) that there was no evidence of actual damage, and hence the verdict for punitive damages was without foundation.

IV. In refusing the defendants' first request to charge.

I. The appellants contend that the reference in the alleged libelous letter to the "previous contract" between the plaintiffs and the defendants was to the logging contract which expired in December, 1923, and that, as there was a suit pending between the parties growing out of an attempted settlement at the expiration of this contract, and as the defendants had set up the truth of some of their statements as a defense in the libel suit, the trial of the libel suit should have been deferred until the previous suit had been heard and determined. The previous suit was brought by the company against the Fitchettes to recover an alleged indebtedness growing out of certain business transactions. Without awaiting the outcome of that suit, the Company made certain statements—claimed by the Fitchettes to be libelous—regarding matters involved therein. The Fitchettes sought to hold the Company to accountability for the alleged libelous statements. The Company then asked that it should not be held to accountability until the truth of its statements had been determined in the prior suit which it had brought. The trial Judge refused to grant the request. The matter of continuance is in the discretion of the trial Judge, and we cannot see that, under the circumstances of this case, there was any abuse of discretion.

II. The second exception imputes error to the trial Judge in admitting testimony as to transactions between the plaintiffs and the Carolina National Bank,

on the ground that it appeared that the copy of the alleged libelous letter was sent to W. A. Clark individually, and that the bank was not mentioned in the letter, and was in no way connected with the subject-matter thereof. The Fitchettes testified, among other things, that they were doing business with the Carolina National Bank, were trying to establish a credit with the bank, and expected to be able to borrow money from it in conducting the Segars timber operation.

It appears from the testimony that Bruton was indebted to the Carolina National Bank, which held a mortgage over the Segars timber, and to W. A. Clark, and that Clark also had some other interest in the timber. The answer of the defendants alleged that the defendants "were informed and believe that the said J. C. Bruton was largely indebted to the Carolina National Bank of Columbia, S. C., of which bank Mr. W. A. Clark was and is an officer"; "that for some time immediately prior to February 23, 1924, the defendants had considerable correspondence with the said J. C. Bruton and with W. A. Clark, representing the said bank, with reference to the change or modification of a certain contract or contracts then existing between the defendant company and the said Bruton, and in which the said Carolina National Bank of Columbia had an interest, which said contracts provided for the sale and delivery of certain hardwood timber by the said Bruton to the defendant Company; that the said Bruton and the said Clark, representing the said bank, requested the defendant company to allow and permit the conditional release of or transfer by the said Bruton of said contracts to other parties, whose names and identities were not disclosed, and both the said Bruton and the said Clark, representing the said bank, urged and importuned the defendant company to consent to such changes or modifications in said contracts." The correspondence here referred to is, of course, the correspondence between the Company and Clark, extracts from which have been set out in the statement of facts. The answer then proceeds to set up the claim that the alleged

libelous letter was qualifiedly privileged; that it "was written in complete good faith and with an interest to be upheld; that the said letter was not nor is libelous nor malicious, but was written on a proper occasion, in a proper manner, and to proper parties only, and that the same was prompted by a duty owing by the defendants to the said Bruton and the said Clark, as representative of said bank, on a subject in which all of said parties had a vital interest, and such writing was fully justified by such circumstances."

It will be seen that the defense of qualified privilege, as set up in the answer, is based, in so far as the publication to Clark is concerned, entirely upon the alleged interest of the bank in the subject-matter of the negotiations, and proceeds on the theory that it was written in response to a duty owing by the defendants to the bank. If the letter, therefore, was not sent to Clark as a representative of the bank, the whole theory of this defense, in so far as the publication to Clark is concerned, fails. In addition, some of the letters of the Sumter Hardwood Company were addressed to Clark as chairman of the board, at least one of Clark's letters to the Company was signed by him as chairman, and Korn, who wrote the alleged libelous letter, knew that Clark was chairman of the board. Clark's testimony that he did not represent the bank in writing the letters is not conclusive; in addition to the allegations of the verified answer, there was testimony from which the jury might conclude that he represented the bank, and it was for them to say in what capacity or capacities he was acting. We do not see how the publication of the letter to Clark can be dissociated from the bank's interest in the subject-matter of the letter and from the alleged duty owing by the appellants to the bank; nor how the appellants can claim, for the purpose of showing that the letter was privileged, that it was sent to Clark as a representative of the bank, and then, for the purpose of excluding testimony with reference to the bank, that it was sent to Clark only as an individual. We find no error in the admission of the testimony objected to.

The fourth exception imputes error to the trial Judge
in refusing to admit in evidence the judgment roll
in the case of *Congaree Cooperage Company v.
Fitchette & Son.* After the alleged libelous letter was writ-
ten, the Fitchettes acquired the Segars timber, otherwise
than from Bruton, and on April 25, 1924, entered into a
contract with the Congaree Cooperage Company for a sale
of some of the logs. Subsequently that Company brought
an action against the Fitchettes in the Court of Common
Pleas for Richland County for alleged damages arising from
the failure of the Fitchettes to carry out the terms of the
contract. The Fitchettes answered, and defended the case,
which resulted in a verdict of $4,000 for the plaintiff, from
which an appeal was taken to the Supreme Court. The
judgment roll in that case was offered in evidence by the de-
fendants at the trial of the libel case, but was excluded by
the trial Judge. In their printed argument the appellant's
counsel state as grounds on which the judgment roll should
have been admitted:

"The obvious purpose was to show that the plaintiffs had
failed to carry out a similar contract involving the identical
timber, which the defendants had refused to enter into with
plaintiffs, and that therefore it had been judicially estab-
lished that plaintiffs did not have the ability to carry out any
such new contract, which confirmed defendant's judgment
and business experience with plaintiffs, and which consti-
tuted a justification for the statements contained in the al-
leged libelous letter. The answer and the judgment in the
*Congaree Cooperage case* was clearly competent as an admis-
sion and finding against Fitchettes that they did not have
'ability' to perform, and was relevant to the issues in this
case, especially as similar contracts with respect to the same
timber were involved therein."

The general rule is that a judgment is not admissible in
evidence against a stranger; that is, one not a party, nor in
privity with a party, to the suit wherein it was rendered.   34

C. J., 1050; 15 R. C. L., 1007. *Newell Contracting Co. v. Blankenship,* 130 S. C., 131; 125 S. E., 420. *McEachern v. Cochran,* 1 McCord, 338. *Gist v. McJunkin,* 1 Speers, 157. *Cave v. Cave,* 101 S. C., 40; 85 S. E., 244, and numerous other authorities. But in the case at bar the judgment roll was offered in evidence, not against, but in favor of, a stranger. As to the admissibility of a judgment roll under these conditions, the rule is thus stated in 15 R. C. L., at page 1008:

"The converse of the principle that a stranger is not bound by a judgment is also true, and a judicial record is not admissible against a party to it in favor of one who is not a party to the suit nor a privy to a party. The fact that a party has fully litigated his cause of action in one suit, and has been defeated, is of no avail in another suit, to which a stranger to the first suit is a party, involving precisely the same issues. In a second suit against one who was a stranger to the first suit, a party may adopt a position inconsistent with that maintained in the prior proceedings."

There are certain exceptions, however, to the general rule. Judgments *in rem* are considered binding on third persons, as are judgments or decrees determining the status or relations of individuals, as, for instance, decrees of divorce and adjudications as to the mental condition of persons, judgments of a public nature, and, for the purpose of proving title, judgments under which a sale of land has taken place. A judgment is admissible also as proof of a fact which from its nature is provable by evidence of general reputation (34 C. J., 1054), or for the purpose of proving a merely collateral fact (10 R. C. L., 1117. 34 C. J., 1054. *Phillips v. Yon,* 61 S. C., 426; 39 S. E., 618). A judgment is admissible to prove the fact of its rendition and its legal consequences. In 22 C. J., at page 801, it is said:

"A judicial record is always admissible to prove the fact that a judgment has been rendered, the time of its rendition, and the terms and effect of the judgment, for the mere fact

that a judgment was given, this being a thing done by public authority, can never be considered as *res inter alios acta,* nor can the legal consequences of the rendition of such judgment be so considered."

So, in the case of *Westchester Fire Insurance Co. v. Bollin,* 106 S. C., 45; 90 S. E., 327, it was held that the judgment roll in an action against an insurance company on a fire insurance policy was admissible to show the amount of damage in an action by the company against its agent for failure to cancel the policy.   See, also, 10 R. C. L., 1116, and 15 R. C. L., 1009.   A judgment roll may also be admissible in behalf of one not a party, to show an admission contained in the pleadings of a party therein, "or because, the judgment being by default, it may be taken as an admission of the material facts well pleaded by the plaintiff." 34 C. J., 1055.   *Willis v. Tozer,* 44 S. C., 1; 21 S. E., 617. But, as said in 34 C. J., 1055:

"A judgment cannot be regarded as evidence of an admission, by the party against whom it was rendered, of the facts adjudicated or determined thereby where he did not make default or affirmatively concede any allegations of the petition, but appeared and answered, denying the allegations of the petition, and contested the suit at every step of its progress to final judgment."

In the present case the Cooperage Company's judgment roll would be admissible, if at all, only (1) to show the fact that a judgment had been rendered in favor of the company against the Fitchettes upon the cause of action stated therein; or (2) to show an admission made by the Fitchettes during the progress of the cause.   If it was admissible on the first ground, the error in excluding it was cured by the fact that one of the Fitchettes testified, without objection, that the Cooperage Company had brought a suit against them on a contract involving a sale of part of the Segars timber and had obtained a judgment against them for $4,000.   If it was admissible on the second ground, its exclusion was not

prejudicial error since the judgment roll as offered in evidence contained no admission whatever by the Fitchettes, showing or tending to show their inability to perform their contract; but, on the contrary, the Fitchettes denied their violation of the contract and fought the case through to its conclusion.

But we are not prepared to say that the judgment roll should have been admitted for any purpose. Even if it be conceded that it would tend to show the Fitchettes' inability to perform the contract on which that suit was based, it must be borne in mind that that contract was made more than two months after the alleged libelous letter was written, and that the suit based on it was not filed till some time thereafter. There was no testimony tending to show that the ability of the Fitchettes to comply with their contracts was the same on April 25, 1924, when the contract with the Cooperage Company was made, or some months later, when the suit was brought, as it was on February 23, 1924, when the alleged libelous letter was written.

III. We come now to a consideration of what we regard as the most important question involved in the appeal; that is, whether there was error on the part of the trial Judge in refusing to order a nonsuit and to direct a verdict for the defendants, which question is raised in the third, fifth, and sixth exceptions.

(a), (b), and (c) It is contended that a nonsuit should have been ordered and a verdict directed for the defendants because the testimony clearly showed that the alleged libelous communication was qualifiedly privileged. In 17 R. C. L., at page 341, with respect to qualified privilege, we find:

"A communication made in good faith on any subject-matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal

one, but only a moral or social duty of imperfect obligation."
. In Newell on Slander and Libel (4th Ed.), at page 380 it is said:

"Qualified privilege * * * extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."

In his dissenting opinion in *Switzer v. Express Co.,* 119 S. C., 237; 112 S. E., 110; 26 A. L. R., 819, quoted in *Duncan v. Record Publishing Co.,* 145 S. C., 196; 143 S. E., 31, Mr. Justice Cothran says, with reference to the question of qualified privilege:

"Was the 'communication,' alleged to have been slanderous, one of qualified privilege; this question depending upon the further question whether or not, the 'occasion' being shown to have been one of qualified privilege, the occasion was so abused, or its bounds so exceeded by ill motive, as to deprive the communication of the qualifiedly privileged character which is presumed by the fact of its utterance upon a qualifiedly privileged occasion?"

It is not enough to show that the occasion was one of privilege, but it must also appear that the communication itself was made in good faith and was privileged as made. Newell (page 418) says:

"But it must be remembered that, although the occasion may be privileged, it is not every communication made on such occasion that is privileged. It is not enough to have an interest or duty in making a communication; the interest or duty must be shown to exist in making the communication complained of. A communication which goes beyond the occasion exceeds the privilege."

See, also, 36 C. J., p. 1242.

In 36 C. J., at page 1248, it is said:

"The protection of the privilege may be lost by the manner of its exercise, although the belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the party making it must be careful to go no farther than his interests or his duties require."

Ordinarily the publication of defamatory words actionable in themselves carries a *prima facie* implication of malice, and the plaintiff is not required to produce proof of malice beyond proof of the publication itself, but where the occasion is privileged there is a "*prima facie* presumption to rebut the inference of malice" and the burden is on the plaintiff to show malice in fact. *Smith v. Youmans,* 3 Hill, 85. *Switzer v. Express Co., supra.* In Newell (4th Ed.), pp. 315, 316, quoted in *Duncan v. Record Publishing Co., supra,* it is said:

"The effect, therefore, of showing that the communication was made upon a privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact; that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff; and this malice in fact, resting as it must upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury. The question whether the occasion is such as to rebut the inference of malice, if the communication be *bona fide,* is one of law for the Court; but whether *bona fides* exist is one of fact for the jury. And the jury may find the existence of actual malice from the language of the communication itself, as well as from extrinsic evidence."

In the *Duncan case, supra,* the defendants contended that the defense of privilege was so conclusively established by the evidence that the trial Judge should have charged "under the circumstances in this case that the publication made by

defendants was qualifiedly privileged," and should have directed a verdict for defendants upon that ground.   In discussing this point, the Court, recognizing the distinction between the "occasion" and the "communication," said:

"It is true, where the evidence is open to no other reasonable inference of fact than that the 'occasion,' in the absence of actual malice, was privileged, the Court might properly so instruct the jury, leaving to the jury only the question of whether the plaintiff had sustained the burden of showing the existence of actual malice.   Or, as pointed out in the majority opinion in the *Switzer case,* where the evidence is susceptible of no other reasonable inference than that (1) the occasion was privileged and (2) that the occasion was not employed in bad faith and with actual malice, for the purpose of making a defamatory communciation, it would be the duty of the Court to hold that the defense of qualified privilege was established and to grant a nonsuit or to direct a verdict for the defendant."

In the same case the defendants requested the Court to charge as follows:

"A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and I charge you that, under the circumstances in this case, the publication made by defendants was qualifiedly privileged, and that you cannot award the plaintiff a verdict, unless you find that the defendants have abused their privilege."

The Court refused to charge as requested, but charged a modification of the request, as follows:

"A publication made in the course of a newspaper war, and bearing some reasonable relation to the subject-matter of the controversy, is qualifiedly privileged, and it is for you to determine from the evidence, applying to the evidence the rules of law stated by me, whether or not, under the circumstances of this case, the publication made by defendants was qualifiedly privileged, and, if it was privileged, then you can

not award the plaintiff a verdict, unless you can find that the defendants were actuated by express or actual malice in making the publication, and have abused their privilege."

The failure to charge as requested was made the subject of exception, but this Court said:

"In the light of the principle enunciated by the foregoing authorities, we do not think the failure to charge, as requested, 'that the publication made by defendants was qualifiedly privileged,' may be held for reversible error, even in the possible view that under the facts of the case the Court might properly have held and charged that the *occasion* was *privileged*. And since the only effect of holding by the Court that the occasion was privileged would have been to require the placing on plaintiff of the burden of showing 'express or actual malice'—a burden which, in effect, was as clearly devolved on plaintiff by this instruction as modified, and by the general charge, as if the Court had expressly assumed and held that the occasion was privileged—we are of the opinion that the point raised by Exception 13 is without substantial merit and must be overruled. And unless the Court could have held as a matter of law that the facts in evidence were susceptible of no other reasonable inference than that the publication was made without actual malice— and it is not seriously contended in argument that under the facts here the trial Court could properly have so held—it follows that there was no error in refusing the motion for nonsuit and for a directed verdict, upon the ground that the defense of privilege had been conclusively established by the evidence."

In the present case it is not contended that the language used in the letter was not, under the circumstances, libelous *per se,* but the defendants sought to justify its use as being qualifiedly privileged. We do not think that the evidence justified the conclusion, as a matter of law, that this defense was established, but that the entire matter was correctly submitted to the jury, to find the facts and to say whether, un-

der all the circumstances of the case, the situation of the parties, etc., the communication was qualifiedly privileged.

On the question of privilege, the trial Judge charged the jury, not unfavorably to the defendants:

"(2) If you find from the testimony in this case that the letter in question was written in a proper manner, to proper parties, in the discharge of a legal or moral duty, rendered necessary by the exigencies of the occasion, then I charge you that it was a privileged communication and your verdict must be for the defendants.   *   *   *

"(3) I charge you that malice on the part of the defendants writing the letter in question is necessary to make out a case for damages for libel, and must be proven by the preponderance of the plaintiffs' testimony before they can be entitled to recover; and, if you find that the letter was written in good faith and for reasonable cause by one engaged in the discharge of a duty, then there is no malice, and you must find for the defendants.   *   *   *

"(4) If you find that the letter in question was written in connection with a subject in which not only the defendants had an interest, but in which the parties to whom it was sent had a corresponding interest, then I charge you that the letter was a privileged communication, if made in good faith and without actual malice, and that your verdict must be for the defendants.   *   *   *

"(5) Where there is a business transaction involving third persons, in which one interested person writes to the other interested persons in good faith and without malice, and not intending that such letter should go any further, his reasons for not wanting to have the business transactions with such third persons, such letter is a privileged and confidential communication; and if you find from the greater weight of the testimony that such are the facts in this case, then I charge you that you must find for the defendants. *   *   * "

The situation here is closely parallel to that in the *Duncan case.* Even if the trial Judge might have charged the jury that the "occasion" was privileged, we can see no prejudicial error in his failure to do so, since, as said in the *Duncan case,* the only effect of such a charge would have been to lay on the plaintiffs the burden of proving express or actual malice, which burden was laid by his charge that malice on the part of the defendants in writing the letter was necessary to make out a case for damages for libel and must be shown by the preponderance of the plaintiffs' testimony. As to the actual malice there was sufficient testimony to go to the jury, who, in deciding that question, might have recourse both to the language of the communication itself and to the extrinsic evidence. It was for the jury to say, too, whether the language used went further than the occasion required, if the occasion was privileged. The jury might reasonably conclude that a mere refusal on the part of the defendants to release the timber if the Fitchettes were to log it—which was undoubtedly their right—would have been all that the occasion required, especially as the defendants were not requested to give the reasons for their refusal, and that the additional language by way of comment went beyond what was necessary to protect their interests or perform their duties and so destroyed the privilege. The truth of the statements contained in the letter was pleaded as justification, but, as there was a great mass of conflicting testimony on this point, that issue was also for the jury.

(d) The appellants contend that there was no evidence of actual damage and hence the verdict for punitive damages was without foundation. There are cases in this State which support the proposition that the law implies some actual damage from every conscious, willful, or reckless invasion of another's rights, and that such implied damage is sufficient as a basis for a verdict for punitive damages. *Jones v. Railway Co.,* 108 S. C., 217; 94 S. E., 490. *Reaves v. Telegraph Co.,* 110 S. C., 233; 96 S.

E., 295.   We have found no South Carolina case involving
this point in a libel suit, but, whatever may be the general
rule as to other causes of action, it appears to be universally
accepted that actual damages are presumed to follow de-
famatory words which are actionable *per se,* and need not be
shown in order to justify a verdict for punitive damages,
the other elements of libel being shown.   This rule follows
naturally from the very meaning of the terms "actionable
*per se"* and "libelous *per se."*

In 33 A. L. R., at page 414, there is an extended note on
the point, and the following cases are there cited in support
of this proposition:   *Vingi v. Lisianski Packing Co.*
(1918); 6 Alaska, 182.   *Kennedy v. Woodrow* (1880);
6 Houst. (Del.), 52.   *Nailor v. Ponder* (1895); 1 Marv.
(Del.), 408; 41 A., 88.   *Schofield v. Baldwin* (1902); 102
Ill. App., 560.   *Moore v. Maxey* (1910); 152 Ill. App.,
647.   *O'Malley v. Illinois Pub. & Printing Co.* (1915); 194
Ill. App., 544.   *Mothersill v. Voliva* (1910); 158 Ill. App.,
16.   *Guard v. Risk* (1858); 11 Ind., 156.   *Manning v.
Meade* (1917); 180 Iowa, 932; 164 N. W., 113.   *Winans
v. Chapman* (1919); 104 Kan., 664; 180 P., 266.   *Gambrill
v. Schooley* (1901); 93 Md., 65; 48 A., 730; 52 L. R. A.,
91; 86 Am. St. Rep., 414.   *Froslee v. Lund's State Bank*
(1915); 131 Minn., 435; 155 N. W., 619.   *Ferguson v.
Evening Chronicle Pub. Co.* (1897); 72 Mo. App., 462.
*Bergman v. Jones* (1883); 94 N. Y., 51.   *Gomez v. Joyce*
(1888); 56 N. Y. Super. Ct., 607; 1 N. Y. S., 337.   *Clark
v. Variety* (1919); 189 App. Div., 462; 178 N. Y. S., 698.
*Upchurch v. Robertson* (1919); 127 N. C., 127; 37 S. E.,
157.   *Cotton v. Fisheries Products Co.* (1921); 181 N. C.,
151; 106 S. E., 487.   *Hygienic Fleeced Underwear Co. v.
Way* (1906); 15 Pa. Dist. R., 943; 33 Pa. Co. Ct., 133,
affirmed in (1908); 35 Pa. Super. Ct., 229.   *King v. Sassa-
man* (1899, Tex. Civ. App.), 54 S. W., 304.   *Ramsay v.
Harrison* (1916); 119 Va., 682; 89 S. E., 977.

This view was properly presented to the jury by the trial Judge in his charge:

That "to publish * * * of a contractor that he does not have the inclination and ability to perform his contracts is * * * libelous *per se,* * * * for the * * * reason * * * all reasonable men would agree that the consequence of such publication would be injurious to the person defamed," and that "from the publication of libelous words, that are actionable in themselves, the law implies * * * that the person of whom they were published has suffered damage as a consequence thereof."

It follows, from what has been said, that actual damages would be presumed from the use of the words involved, and that, the other elements of libel being shown, the jury would be justified in finding a verdict for punitive damages only. In this view of the matter it is not necessary to consider the question whether there was any testimony showing actual damage.

IV. The seventh exception imputes error to the trial Judge in refusing to charge the defendants' first request, as follows:

"Under the statute law of this State, the defendants have the right to allege and prove the truth of the contents of the letter in question as a complete justification therefor, and if you find, from the preponderance of the testimony in this case, that the statements in the letter were substantially true, or correctly expressed the honest opinion of the writer, then I charge you such writing was justifiable, and that you must find for the defendants. However, should you not find that the writing was entirely justifiable, you cannot consider that as a circumstance in aggravation; but you should, on the other hand, take into consideration all mitigating circumstances surrounding the transaction."

This request contains at least two erroneous propositions of law. In the first place, it would present to the jury as alternative justifications of a defamatory letter (a) the truth

of the statements therein contained, and (b) the honest, but erroneous, opinion, of the writer, though expressed in malice. To tell the jury, without more, that the honest opinion of the writer of defamatory matter is complete justification therefor would take from the jury the question of malice, and would be error.

In the second place, the language that the jury should "take into consideration all mitigating circumstances surrounding the transaction" would be a charge on the fact, as equivalent to saying *that there were mitigating circumstances.* It is said in *Lorenzo v. Railroad Co.,* 101 S. C., 409; 85 S. E., 964:

"The appellant complains, also, that at least a part of the seventh request to charge was unquestionably good law and should have been charged. Each request to charge is a unit. The requests to charge are handed up to the Judge just befor the argument begins, under some circumstances maybe after argument. He cannot fully determine the exact bounds of his charge until he has heard the whole case. He has only a short time to consider the requests, and cannot be expected to weed out the bad law and charge that which is good. Parties are required to state propositions of law that they desire charged; to state them clearly and succinctly and cite the authorities relied upon. If the proposition is correct and applicable, then a failure to charge is reversible error. If not, it is not reversible error."

See, also, *McGee v. Wells,* 52 S. C., 472; 30 S. E., 602.

There was no error in refusing to charge as requested. All exceptions are overruled and the judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and CARTER concur.

MR. JUSTICE COTHRAN (dissenting): I respectfully dissent from the conclusions announced in the leading opinion, for the reasons which follow:

The gravamen of the charge of libel is that Korn, president of the defendant corporation (both of whom are defendants in the action), wrote a letter to W. A. Clark, chairman of the Board of Directors of the Carolina National Bank, of and concerning the plaintiffs, Fitchette & Son, as follows:

"It will not be satisfactory to us to deal with Fitchette & Son. They have fallen down on previous contract we had with them. Their account was much overdrawn when they left us, and when it came time for a settlement they totally disregarded their contract. We have lost confidence in them, and do not think they have either the ability or the inclination to carry out any new contract that might be made with them."

Assuming, without expressing an opinion to that effect, that the language used in this letter is libelous *per se,* I think that the circumstances under which it was written present as clear a case of "qualified privilege," unaccompanied by any circumstance tending to show a malicious intent to injure (an abuse of that privilege), as could possibly be conceived.

The law, as I understand it, is that a communication, *made in good faith* on any subject in which *the writer has an interest,* or in reference to which *he has a duty to perform,* is not the subject of an action in libel for damages, it being protected under the principle of "qualified privilege." An essential element of this principle being that it was "made in good faith," it is necessarily implied that if it has been made with malice, a wicked intent to injure, it was not made in good faith, and is entitled to no protection.

I understand it further to be the law that, if the communication appear *prima facie* within the safety zone of "qualified privilege," the burden is upon the party claiming to have been aggrieved by the publication to overcome the presumption of good faith, by proof of a malicious purpose to defame his character, under cover of the privilege.

I understand it further to be the law that the question whether or not the communication was, under the admitted facts, within the class of "qualified privilege," is one of law for the Court; and, if taken in connection therewith, it was such as must have been used honestly and in good faith by the defendant (therefore wanting in a malicious purpose), the Judge may withdraw the case from the jury and direct a verdict for the defendant. 25 Cyc., 375, 385, 376. 17 R. C. L., 341, 418. *Atwater v. News Co.,* 67 Conn., 504; 34 A., 865; note 3 L. R. A. (N. S.), 696. *Smith v. Youmans,* 3 Hill, 85. *Abraham v. Baldwin,* 52 Fla., 151; 42 So., 591; 10 L. R. A. (N. S.), 1051; 10 Ann. Cas., 1148. *Beeler v. Jackson,* 64 Md., 589; 2 A., 916. *Hemmens v. Nelson,* 138 N. Y., 517; 34 N. E., 342; 20 L. R. A., 440. *King v. Patterson,* 49 N. J., Law, 417; 9 A., 705; 60 Am. Rep., 622. *Fahey v. Shafer,* 98 Wash., 517; 167 P., 118. *Massee v. Williams* (C. C. A.), 207 F., 222; Starkie, Slander, § 670; Townshend, Slander, § 349; Newell, Slander, § 389. *Melcher v. Beeler,* 48 Colo., 233; 110 P., 181; 139 Am. St. Rep., 273. *Denver v. Holloway,* 34 Colo., 432; 83 P., 131; 3 L. R. A. (N. S.), 696; 114 Am. St. Rep., 171; 7 Ann. Cas., 840. *Locke v. Bradstreet* (C. C. A.), 22 F., 771; 25 Cyc., 392.

See the quotations from these authorities set forth in the opinion of the writer in *Switzer v. Express Co.,* 119 S. C., 237; 112 S. E., 110; 26 A. L. R., 819, which do not lose their force by reason of the fact that they are cited in a dissenting opinion. The citations and quotations contained in the leading opinion herein also sustain these principles without exception.

In *Massee v. Williams* (C. C. A.), 207 F., 222, the Court said:

"The occasion being privileged, the communication did not amount to actionable defamation until it appeared that it had its origin in actual malice [citing authorities]. It was therefore incumbent on the plaintiff to show such malice

in addition to injurious utterances, and that the defendant seized upon the occasion as a pretext or otherwise availed himself of it maliciously  *  *  *  to slander him [citing authorities]."

"Exceeding the privilege of a communication about a matter in which both parties have an interest does not destroy the privilege, but the excess of statement is material only as bearing on the question of malice." *Nichols v. Eaton,* 110 Iowa, 509; 81 N. W., 792; 47 L. R. A., 483; 80 Am. St. Rep., 319.

"A communication by a life insurance company to its soliciting agent, with relation to an alleged forgery, by an examining physician, of the signature to an application for insurance, and informing him that another physician would be appointed to make examinations, being upon a subject relating to agency, and in respect to which there is a mutual interest, is a privileged occasion." *Nichols v. Eaton,* 110 Iowa, 509; 81 N. W., 792; 47 L. R. A., 483; 80 Am. St. Rep., 319.

In *Stroud v. Harris* (C. C. A.), 5 F. (2d), 25, a bondholder and stockholder was sued in libel for writing to other stockholders a letter seriously reflecting upon the integrity of the manager of the corporation. The Court said, in sustaining the direction of a verdict in his favor:

"The statements he made in the letter were not only for the purpose of protecting his own interests, but their interests also, and show that he was attempting to protect the stockholders as well. Some of the statements may be slightly exaggerated;  *  *  *  but the evidence is sufficient to show that he was stating what he honestly believed to be true, and what, from statements made to him by parties in whom he had confidence, he had reasonable ground to believe was true. The letter was a qualifiedly privileged communication, and there is nothing to show that McAdams was actuated by any malice whatever."

It is material, therefore, to inquire, first, whether the communication, *prima facie,* is entitled to be classed as one of "qualified privilege"; second, whether, if so, has the plaintiff offered any evidence tending to show that it was not made in good faith, but that the *occasion* was employed as a cloak to cover a splenetic and malicious attack—an abuse of the privilege.   The circumstances under which the letter was written were these:

At some time prior to January 1, 1924, one J. C. Bruton, who owned or controlled a large tract of timberland, known as the Segars tract, entered into a contract with the Sumter Hardwood Company for the sale to it of about 1,000,000 feet of the log output of his operations on the Segars tract, at the price of $14 per thousand feet.   Bruton was indebted in a large amount to the Carolina National Bank, to which he had given a mortgage upon the timber as security, and also to W. A. Clark, then chairman of the board of directors of that bank, personally, who it appears also had an undefined interest in the Bruton timber.   For financial reasons, Bruton became unable to comply with his contract to deliver the logs to the Hardwood Company.   The bank and Clark were, of course, greatly interested in Bruton's compliance with that contract, from which alone they expected to be reimbursed for the money owing by Bruton, and doubtless were urging him, if he could not comply, to find some one who could. Negotiations were then opened between Bruton and Clark, on the one side, and the plaintiffs, Fitchette & Son, on the other, looking to that end.

Prior to this date, in 1921, Fitchette & Son had entered into a contract with the Hardwood Company for the logging of certain timber upon a different tract.   This contract had expired in December, 1923; at its expiration, the Fitchettes were indebted to the Hardwood Company, and the Company agreed to take over, in the settlement, certain equipment and supplies.   A disagreement arose as to the value to be placed upon these articles, and as to certain items in the accounts be-

tween them; this controversy resulted in a lawsuit instituted by the Hardwood Company, a phase of which has been before this Court heretofore. See 133 S. C., 149; 130 S. E., 881. This case was pending at the time of the trial of the case at bar, and also at the time of the alleged libelous letter. In it the Hardwood Company claimed a balance due of over $4,500, and the Fitchettes a balance due them of over $5,-000; the parties were nearly $10,000 apart.

On February 4, 1924, Clark wrote the Hardwood Company, advising that, in his opinion, Bruton was utterly unable to comply with his contract with them for the logs from the Segars tract, but that Bruton thought that he could interest another party, who would purchase the timber from Bruton and step into his shoes. He inquired of the Hardwood Company whether they would be willing to cancel the contract with Bruton, allow him to contract with the "dark horse," and accept him in the stead of Bruton. All of these parties, Clark, Bruton, and the Fitchettes, studiously concealed the fact that the Fitchettes were the party with whom they were dealing. For nearly three weeks, after request upon request from the Hardwood Company to reveal the name of the party who was expected to take Bruton's place in the contract, the program of camouflage was maintained. It was not until February 21, when it was realized that nothing could be accomplished with the Hardwood Company until the identity of the party should be revealed (a matter of fairness and great moment to the Hardwood Company), that it was revealed in a letter from Bruton to the Hardwood Company that the Fitchettes, the men who were at war with the Hardwood Company, in a bitter fight involving $10,000 and all sorts of charges, were the party who were expected to faithfully comply with the Bruton contract and give their belligerents a square deal.

Reviewing the immediately preceding events, it appears that on February 12th, in answer to his letter of the 4th, the company wrote to Clark that they were willing for a substi-

tution, provided that some arrangement could be made whereby they *would be sure* of obtaining the lumber which Bruton had contracted to deliver; that it was their desire to co-operate in any way that would benefit Clark and Bruton, but, of course, not to their own detriment. On February 13th, Clark notified the Hardwood Company that a contract had been drawn up between Bruton and an unnamed party, looking to the acquisition by the unnamed party of Bruton's timber rights and the substitution of such party in Bruton's stead, his assumption of Bruton's obligations to the Hardwood Company, and of course, Bruton's release. Copies of the material parts of the contract were forwarded with Clark's letter, and a request that the Hardwood Company signify their approval of the contract *by wire.* As a matter of fact, the contract between Bruton and the Fitchettes was actually executed by both parties on February 14th, as the exhibit in the transcript shows. On February 16th the Hardwood Company wrote to Clark, asking for information as to the identity of the party with whom he and Bruton were negotiating, stating:

"Where the price, grade, measurements, etc., are to be daily dealt with, *we must know who we are trading with.* If the parties are acting in good faith, why should they wish to remain concealed in the background while these negotiations with us are going on?"

On the 19th, Clark replied, still concealing the fact that the Fitchettes were the party. On the 20th the Hardwood Company again pressed Clark to make the revelation:

"If we consent to take 1,000,000 feet of logs and release Bruton from further obligations, *we want to know who is going to furnish these logs to us;* also at what price and when. We have asked for this information before, but for some reason the information has been withheld."

Still no response from Clark. On the same day the company wrote Bruton, pressing him for the information they unquestionably were entitled to. On the 21st, the "smoking

out" process was completed by a letter from Bruton naming the Fitchettes as the party, and stating that the concealment was at their *instigation.* Then, on the 23d, Korn wrote the letter upon which the action for libel is based.

Soon thereafter the contract between Bruton and the Fitchettes, which had been executed, as stated, on February 14th, was put into effect, despite the positive declination of the company to deal with the Fitchettes in the proposed substitution of them for Bruton, and the release of Bruton, despite their protest in a matter peculiarly of interest to them. By that contract the Fitchettes acquired Bruton's interest in the timber, though of course without the release of Bruton from his contract with the company. The Fitchettes then entered into a contract with the Congaree Cooperage Company, without the knowledge or consent of the Hardwood Company, to deliver to the Cooperage Company the identical timber that Bruton had contracted to deliver to the Hardwood Company, as brazen a fraud upon the rights of the Hardwood Company as could be conceived. The Fitchettes knew of the contract between Bruton and the Hardwood Company, for they were endeavoring to be substituted for him in the contract; they knew that the Hardwood Compay would not accept them as a substitute for Bruton; they concealed their identity in the negotiations, and prevailed upon both Bruton and Clark to do the same, in their effort to complete a contract with Bruton, insuring his release from the Hardwood contract, and forcing the Hardwood Company to accept them as Bruton's substitute; they knew that a recovery of damages against Bruton by the Hardwood Company for a breach of his contract, was "a feather in a jaybird's tail," and when they learned that their scheme had, like "many a plan of mice and men, gang aft agley," they practically robbed the Hardwood Company of their interest in the Bruton contract, by entering into a similar contract with the Congaree Cooperage Company. Before that contract was complied with, the Cooperage Company had to

sue them, and recovered a judgment of $4,000 against them for damages on account of its breach, a fact that strongly corroborates the estimate of them in the letter of Korn. As a specimen of deliberate scheming and deceit and resentfulness, it takes high rank in my estimation, and leads me to think that Korn's appreciation of them was a· weak solution of what he might have said.

Under these circumstances, can there be a doubt that the letter of Korn comes within the immunity accorded to a communication of "qualified privilege"? All of the parties to the negotiations pending at the time the letter was written, the Hardwood Company, the bank, Clark, and Bruton (not to speak of the submerged Fitchettes), were directly and financially interested in them. The Hardwood Company was engaged in manufacturing lumber; it had to have logs to saw; it had a contract with Bruton for a million feet of logs; it was at least a part of the source of supply, which it was entitled to rely upon; if Bruton was unable to comply with his contract, the Hardwood Company had the right to insist, either upon damages for the breach, or that some one, *able to comply,* be substituted for Bruton; the negotiations were proceeding upon the theory that Bruton was unable to comply, and, if so that the Hardwood Company's claim for damages against him would be worth about as much as the feathery assets above referred to; the Hardwood Company was therefore confined for relief to securing a fit·substitute for Bruton. It was all that they had left, and surely they were entitled to be consulted in that substitution.

The bank was interested, for it appears that Bruton owed it money which he was unable to pay, and all the security furnished by him was a mortgage upon the standing timber, hardly to be considered as a *liquid* asset. Its only chance was for Bruton to get out the logs and comply with the Hardwood Company contract; he was unable to do so; some one must be found to take his place; the ·Fitchettes became interested, and the bank, that the Fitchettes be substituted

for Bruton. Clark was interested the same as the bank, though possibly to a smaller extent. Bruton was interested, theoretically, perhaps, in being relieved of his obligation under the Hardwood Company contract. It may have concerned him a little as to the ultimate result, but even a man unable to respond to damages is interested in the elimination of all liability on account of the breach of the contract.

All four, therefore, had interests to subserve in the result of the negotiations. If the interest had been confined to the Hardwood Company alone, what was written in explanation of their attitude towards the negotiations and proposed adjustment of the matter was clearly within their rights. If the interest had been confined to the bank, or to Clark, alone, and the Hardwood Company reasonably was under an obligation to them to notify them of the character or ability of the Fitchettes, the communication would have been privileged.

Under these circumstances, as the bank had found a party to take over Bruton's interests and assume his obligation to the Hardwood Company, with a near prospect of realizing from their collateral, it was but natural that in disappointing their expectations the Hardwood Company, in their own interest and in the interest of the bank, should give their estimate of the party whose anticipated activities meant so much to both. They had a duty to perform to both the bank and Clark, and to Bruton. They knew that Bruton was heavily involved to the bank and to Clark. They knew that the bank and Clark, as well as Bruton, were anxious to carry through a plan of substitution, and were greatly interested and active in getting their money out of Bruton, the only chance being from the logging operations. Bruton had fallen down on his contract with the Hardwood people, and it was the effort of Clark to get some one to take his place. From his letter Clark naturally thought that it was necessary, in order to install some one else in the operations that the contract with the company be canceled. He evidently

supposed that the company was standing in the way; the company naturally assumed that it was, and doubtless was obstructing or at least delaying the consummation. They were insisting upon knowing who the other party was, and stated that they had to know before consenting. After they found out, by much corkscrewing, who the other party was, it was clearly their duty to report whether he was acceptable to them or not. They reported that he was not, and gave them reasons therefor which acted as an explanation of their unwillingness to accept the proposed substitute, and as a storm signal to the bank; a signal which doubtless subsequent events proved that they would have been wise to have heeded.

The reasons which Korn gave are reflected in the evidence as true; if not exactly accurate in all particulars, they appear to have been sustained to the extent, at least, of generating a well-founded belief in Korn. He stated in his letter:

(1) "They have fallen down on the previous contract the Hardwood Company had with them."

Any doubt about this? They admit it. If not, it was only what was alleged in the complaint in the action now pending; certainly not libelous in any sense.

(2) "Their account was much overdrawn when they left us."

This was no more than was alleged in the complaint, and, if incorrect, was not libelous, as imputing a crime. *James v. Telegraph Co.,* 130 S. C., 533; 126 S. E., 653. *Willamson v. Askin & Marine Co.,* 138 S. C., 47; 136 S. E., 21.

(3) "When it came time for a settlement, they totally disregarded their contract."

Exactly what had been alleged in the complaint; in no sense libelous per se.

(4) "We have lost confidence in them."

A personal matter, that cannot be inquired into. Whether groundless or not, it was a sentiment entertained by the

Hardwood Company, which was sufficient to cause them to decline a new affiliation.

(5) "We * * * do not think they have either the ability or the inclination to carry out any new contract that might be made with them."

Not an attack upon the Fichettes, but a plain statement of why they were not acceptable to the Hardwood Company as a substitute for Bruton. The Hardwood Company had the unquestionable right to decide this matter, and a candor, which the others in the negotiation were far from displaying, required them to state their reasons. In consideration of his experiences with the Fitchettes, I think that Korn may well say, as Warren Hastings said upon his trial for peculations in India, "In view of my opportunities, I am amazed at my own moderation."

That in the contract referred to by Korn in the letter in review the Fitchettes "fell down" is conceded; that their account was much overdrawn there can be no question; that they disregarded their contract is equally true; that they had neither the ability or inclination to carry out any new contract has been verified by their experience with the Congaree Cooperage Company. If all of these statements were not strictly accurate, and even if libelous on their face, the occasion was privileged and without malice.

Of course, Bruton had the legal right to transfer his contract with the company to the Fitchettes, or any one else, unless there was a condition prohibiting such transfer; but what Bruton wanted was to substitute the Fitchettes for himself, and to be relieved of his personal responsibility, which he, of course, could not do without the consent of the company. Bruton and the bank and Clark must have known of the business differences between the Fitchettes and the company; the insistence of the Fitchettes that they be not known in the matter was enough to excite the belief that the Fitchettes would not be acceptable to the company as a substitute for Bruton; and yet they endeavored to obtain

from the company a cancellation of the contract with Bruton, in such shape as to saddle the company with a party to the new arrangement who they knew was personally obnoxius to them, and in order to do this it must not be known who the party was. When it was known, Korn wrote the above, which he had a perfect right to do, and the experience of the Cooperage Company with the Fitchettes justifies his action.

To say that one who is vitally interested in the substitution of one debtor for another has not the right, in explanation of his refusal, to give such reasons as the above, strikes at the very bowels of the principle of "qualified privilege." That it was within that privilege I have not a doubt; and the only question remaining is: Was the exercise of that privilege accompanied by a single trace of malicious purpose on the part of the company? The evidence is overwhelming to my mind that the company was acting as any man of business, careful of his own interests, would have acted, in the exercise of his right to speak his mind about the Fitchettes, and in the performance of a duty which he owed to Bruton, the bank, and Clark.

Both Clark and Bruton testified that they considered what Korn had written as nothing more than the statement of business differences between the Fitchettes and the company; and the result proves what they said to be true, for, notwithstanding the protest of the company, Bruton and Clark proceeded to consummate the arrangement by which the Fitchettes acquired the Bruton timber rights, made a new contract with the Cooperage Company, and stuck them to the tune of $4,000. What became of the bank and Clark in this new symposium is left to conjecture.